Your Honor, since this case involves a cross-appeal, we're still only having a few minutes, so I'd like to reserve seven minutes, if I could, for a response. I try to keep track of your several minutes. You've got a clock there. If I remember, I'll tell you. But I rarely do. OK. Sorry. Thank you. May it please the court. My name is Breck signing where I represent a single individual named Jim Stefano. Mr. Stefano was at one time an engineer, very high-level engineer, who worked at Micron Technology. This case involves the facts that are in the record. It involves Idaho law. I don't really think there's any questions of federal law in it, and it involves principles that may be abstract, but they're very important to an understanding of Idaho law, specifically with respect to public policy. The principle really that's involved in this case is freedom of speech, but we don't rely on any authority that provides for freedom of speech as we know it in the context of constitutional law. Rather, we essentially provide an argument to you that this case involves freedom of speech that's been promised as a benefit. The facts are very, very complex, but for purposes of summary judgment and asking this court to vacate it, they can be summed up as follows. Micron Technology is a very large company that produces the computer chips that you put inside a computer. It had begun in Boise and it grew and it grew very largely as a result of the brilliance of a man by the name Tyler Lowry, who was for all intents and purposes the Edison of integrated circuits with respect to at least Micron's success. The only reason I tell you that is because Micron at the time that these events happened was in a very precarious position. It had to compete against foreign companies whose labor costs were next to nothing. Now, as you know, in a manufacturing business for an American manufacturing firm to compete against those kinds of labor costs is a problem. But it could be done in the high tech area if the engineering was brilliant enough, because if you could produce if you could engineer these things so well that you were far enough ahead to offset that labor differential, you could survive. That's what Tyler Lowry, who had previously been the CEO of Micron, had done. Tyler Lowry had left. We'll get into that. Micron was in a precarious position. It had a member of the board by the name of Director Jerry Hess. He was on the audit committee. Mr. Hess and other board members had received information that Micron was needlessly losing 100 to 150 million dollars a quarter. OK, 400 to 600 million dollars a year. And so this information potentially involved the life or death of Micron. Mr. Hess and other individuals had asked management about this information. But Mr. Hess and another director, Mr. Smith, believed that management was not responding to what the information was valid, but simply showing irritation and dismissing the situation. This put a this put these gentlemen in a dilemma because under Idaho law. And I'll get to that in a minute if I have time. Which do when you say these gentlemen, which were you referring to? My wife told me not to do that. Directors Hess and. Directors Hess, Smith and Nicholson, the outside directors on the outside directors. Yes. Are they all on the audit committee? I do not. I believe I know Hess was on the audit committee. I believe the other two are. But I'm not sure. OK. Under Idaho law, directors, number one, have a duty to manage the company. We said the authority for that. And number two, by law, they cannot rely on information given to them by management if they believe that the information is on is it's not reasonable to rely on. So they get information that makes it look like something is at the jugular vein of this company. They ask for information from management. They can't get it. Now, they thought about going to a consulting company. Actually, consulting company called Anderson Consulting, which since this case we've heard about in connection with Enron. But they didn't want to go there because they didn't want to rock the boat. They did. They were in a precarious position. So Mr. Hess went to Mr. Tyler Lowry. Tyler Lowry was no longer the working for the company, but he was under a two year contract requiring confidentiality and providing for him to be able to consult if he and the company agreed. Mr. Mr. Hess didn't understand the numbers. He went to Mr. Lowry. Mr. Lowry said, well, if these numbers are correct, we've got some real problems here. People are not essentially. I'm paraphrasing. We have huge mismanagement. Mr. Mr. Hess wanted to meet with J.R. Simplot. J.R. Simplot is just another director in one sense. But in Idaho, he's the guy with the highest house in the world and he's a potato king and he's got a lot of money. So the idea was that Mr. Lowry would contact engineers that he knew and say, get Mr. Hess some information. Through a series of intermediaries, Mr. Stefano was contacted. He provided, he faxed the information, he gathered the information that was corrected, he faxed it directly to Mr. Hess. There is absolutely no evidence that Mr. Stefano, at least through Mr. Stefano and frankly nowhere else, that this information ever went to Mr. Lowry. One of the big contentions. Even if it did, I don't think it makes a difference. But there's no evidence that it ever went to Mr. Lowry. Did it not even go back to Mr. Lowry to get him to help interpret it? No. It went directly to Hess. Now, along with that, there was some criticism. They suggested that the president be replaced by the man that's under the two year contract. That's correct. I can't remember the exact words when I say that's correct. But let me. That's the gist of all this. Can I ask you something? You're I understand your basic contention that you have an actual contract and you say that in effect it's been modified or amended by promises or representations made by the employer. That there would be certain policies that would be enforced. And that if the employees that there's an implied promise that if you follow that policy, you won't be discharged for doing that. What is the evidence that would get you by summary judgment? OK. Yeah, that's essentially it. Let me just I'm going to just digress just a second. Idaho implied contract can be approved by all of the circumstances taken together, including facts and statements. OK. There is in the record an abundance of evidence that it was widely understood at Micron that there was a, quote, an open door policy that anybody could discuss with anyone operating results, good or bad. But let's put all that evidence aside for a minute and talk about discuss with anyone how broadly including board of directors. Well, it doesn't expressly say it, but it says anybody in the company. So I guess that raises an issue whether the board of directors are in the company or that they manage the company. In a sense, they have to make decisions about the welfare of the company. They're supposed to. So if there's an open door, my view would be subject to argument and further thinking that at least if there's an open door policy, it wouldn't exclude directors. The question would be, what are you allowed to tell them in response to what? Right. Well, what is the evidence of such a policy? All right. There is an abundance of evidence, but let me talk first about the admissions. OK, because Micron has admitted there's a policy. And and and to answer this question, because this is this is was this was the most important evidence. And it's not this guy. I raised it to the magistrate, to the district court. And it's never been discussed in an opinion. OK, so let me tell you about it. And if I can do it, let me just tell you one quote that's always moved me a lot. Gerta said, if you can do a thing or think you can begin, action has boldness, power and magic. Here's what happened. These people came to me. They under circumstances that I didn't know a lot about this kind of law, but I think any reasonable person would find pretty abhorrent. And I was fearful that they might expose themselves to an attorney's fees claim if they sued for breach of contract, public policy or implied government. And I knew because of the things that have been written that Micron was taking the position of what they did was wrong. So I filed a tort suit and the tort suit said that Mr. Hess was wrong to ask them for information and involve them in communications with him and that his conduct brought about the tort. That was given to the it was filed. The newspaper went to the general counsel and spoke to the general counsel and the spokesman. And those people told the newspaper, made the public statements that basically directors could ask any employee for information. Any employee could give information without fear of retaliation. Now, that, in my mind, was absolutely an admission. It was made for purposes. It was with respect to this litigation. And I knew that we would get past summary judgment on the contract. Yeah, we didn't get past it because I brought it up again and again and again. And it has never been discussed. Whatever the result is, and your view of that evidence, your decision will be the first time it's been discussed in this case in an opinion. Now, in addition to that, sir, these people started out they had the typical at will employment language, however, subsequently and they and they at least up to six years prior to this. They subsequently signed a handbook and and agreed that it was at will. But there is an invidiousness to the nomenclature of that will, because, as you know, at will means you can be hired or fired. I mean, you can stay or quit for any reason or no reason. But we all know that's not true because you can't do it for the legal reason. Mike Brown, there are many documents in which Mike Brown encouraged these people to have to brainstorm, to discuss operating results, good and bad with everyone else that said job security is important. My individuals could not point to a specific statement that was made to them. And the district court concluded that that was fatal. And it is fatal to an express contract. And it is fatal to a fraud claim. But reliance is not an element of an implied contract claim. In fact, the Idaho law is and the law generally around the country is that an employment contract is a unilateral contract and that anything that the employer offers is presumed to have been accepted by the continued employment of the employee. That authority is in my brief. So it is true that six years before this, my client author and that these people don't read this. These engineers will work. You know, many, many in your life that will work 80 and 90 hours like this, except maybe a law student or a first year clerk. Nobody reads these things. I mean, that's the reality of it. And it's the law bows down to it. And if it didn't, we wouldn't have Enron. OK, I can tell you right now that this case is about the same principles as Enron. And it is a case that in my judgment, everything in Enron happened because we have promoted a legal culture in which we can have silence by fear. OK, this little five foot six guy stood up against this. And he is why you asked me to let you know when you were down to seven. Yeah. And I'm way past 30 seconds. Gentlemen, I'll sit down and say I have a lot more I could tell you about this, but I I know who you are. And I and I know that although my my brief is a little bit rambling and I hadn't yet been diagnosed with attention deficit disorder and I hadn't. I read it last night, saw these punctuation problems. It's in there, everything, these three claims and in particular, this Thomas decision that came down that really wasn't there if the district court had had the benefit of the Thomas decision, it wasn't a few in the country that says that as a matter of public policy reporting within the company about wrongdoing and not just criminal wrongdoing, doing unnecessary work is protecting activity. I don't think we'd be here today. Thank you. I'll sit down and respond later. Thank you. We'll see you at rebuttal. Good afternoon. May it please the court. My name is Robert Long. I'm appearing here today on behalf of the respondent and cross-appellant Micron Technology, Inc. I would like to first address the appeal of the granting of the summary judgment motion that was brought by Micron. Secondarily, briefly discuss Micron's cross-appeal of the ruling on award of attorney's fees. In regard to the summary judgment ruling, I have just some brief comments, a response to a couple of points of Mr. Sininger and then I'm, of course, open to any questions the court may have. I think it's important to reflect again on the fact at the outset here that this is a diversity case in which the substantive law of Idaho applies. Idaho is one of those states that supports at-will employment. It's well-established in the law of Idaho. The exceptions to employer's right to terminate employees are very, very narrowly drawn. The district court here, first with the magistrate judge who was a former justice of the Idaho Supreme Court and then the district judge who himself was a Idaho district judge before coming to the federal bench, correctly applied the law of Idaho to this case and to the undisputed facts of this case. This is not a complex case, as Mr. Sininger would like to make it out to be. This is not a case about Tyler Lowry and his ideas for management and his struggle for management control of Micron. That was the case that was consistently litigated below, but that is not the essence of this case. The essence of this case is the employment relationship that existed between Mr. Chicago on one hand and Micron Technology on the other. Do you think there's any barrier to your hiring an employee who reports wrongdoing to the board of directors? I'm not saying that's what happened here. I'm saying if if an employee reported wrongdoing to the board of directors, could he be fired for that under the at will contract? I think that's an interesting issue that the Idaho courts have yet to address, but it clearly is not the case here. There are no I said I'm not saying that's the case. I'm just asking whether that what would the answer be under Idaho law? I don't know what the answer to that would be. And indeed, I think the district court itself was unclear what the answer to that would be. And that's why they went through the analytical basis they did of adjudicating the public policy claim. They basically gave gave the claimant here the benefit of the doubt as would would there be an exception to the under the public policy exception to termination of at will employment? And then proceeded to find that under no under the undisputed facts, there was no way that there were sufficient evidence that a reasonable jury could ever determine that he would fit within that exception. In part, that rationale was based on the admitted conduct of this particular claimant, but also I suspect underlying that was the notion that this is not a case that involves reporting of any illegal, improper, unethical conduct. This is not an Enron case. This is a case in which Tyler Lowry, a former employee officer of this company, in conjunction with this plaintiff, were continuing to try to stir the pot to create turmoil within this company. Well, that's what you say. But it's clear that's what the evidence provides. It is a pretty loaded word, stir the pot, create turmoil within this company. What they say is that this plaintiff was responding to a request by one member of the board of directors for information about what's going on when in the circumstances of the case, as they see it and as they stated, the board of directors was being stolen by management. The this is not a there's two different ways of looking at this, and that's your way. Yeah, this is not a mere response to a request coming from a member of the board of directors. This was a response in which there was never any connection between Mr. Hess, upon whom they rely, and Mr. Stefano. This came through, admittedly, through an intermediary, the disgruntled former chief technical officer of this company. Well, you say intermediary, the information was not sent directly to Mr. Hess? The information was sent to Mr. Hess. It was not the information Mr. Hess allegedly had requested. Now, the only person who's testified that Mr. Hess even made such a response in this case is Tyler Lowry. Mr. Hess? And we're supposed to disregard that statement? No. The truth of that statement can be tested later, but we're supposed to disregard it now? I'm not suggesting you disregard it. I'm suggesting that the clear chain here was from, if any existed, was from Mr. Hess to Mr. Lowry, Mr. Lowry to his friends, Mr. Patoglio, Mr. Stefano. And what happened here was not a response to a request for information. What happened here was an attack, a personal attack. Wait a minute. You say it's not a response to a request for information, but I gather we have evidence on the record that that's what it was. There is – the evidence on the record of what was communicated is quite clear. One can read it. It's right – it's right there as to exactly what the communication was that went from Mr. Stefano anonymously by fax at 3 o'clock in the morning to Mr. Hess' construction company. We know exactly what that is. Right. And – but you're saying that there's no evidence in the record that it was requested, or you're not saying that? There – part of what was allegedly requested was communicated, but it went far beyond that communication. Far beyond the request? Far beyond the request. And how do we know what the scope of the request was? The – we take – we take as a – an admitted fact for purposes of this – of the summary judgment motion, what Mr. Tyler Lowry stated was what he communicated to Mr. Patoglio and then Mr. – Mr. Stefano as to the information that Mr. Hess had requested. You take that as – He wanted information, as I recall – you could be more precise if you'd help me out – but that Mr. Hess wanted information about yields, about certain products. That – that is what Mr. – Mr. Lowry reported, that Mr. Hess wanted updated information about the yields on specifically enumerated products. So that – that if there had been a response that just gave data, objective data about yields of products, then I guess I take it that Micron's position is we – maybe we wouldn't have been here if Stefano had just faxed data about yields, but his communication contained other statements, lack of vision of the CEO or whatever, that – that you – that Micron says weren't really – that they're insubordinate and disruptive and so on. There were other problems with the way in which Mr. Stefano went about this, so that had there been simply a communication of the data, it would still have been in violation of Micron's established policies. This was the most sensitive of all of the – of the internal manufacturing data that Micron had, to communicate it in this form, the way in which he did, outside the company. To send a fax to Mr. Hess's construction company, it might be confidential data, there would be problems with that. You'd say even – even if it had just been – been data. If it had been data, it would have been a problem. There's one other very significant problem, and that is he sent it anonymously. Sending it anonymously puts it in a position, even if it was just objective data, in which it really couldn't be relied upon by anyone. The statute on which Mr. Stefano relies for the creation of a public policy exception here says, in effect, directors are entitled to rely upon information coming from the company if they have reason to believe that it's reliable. There's no way that Mr. Hess could have viewed any of this information as reliable. He had no idea where it had come from. Well, of course, he had a pretty good idea where it had come from, because according to some testimony, he had requested that it be given to him. He – he had requested information, but he – he had no way of knowing when the information came to him whether it came from a reliable source within the company or not. He had a way of guessing.  I mean, this is – this information, if I'm Hess and I'm worried about what's going on in the company and I'm getting stonewalled by the management, now, this can be remained to be proven at trial, whether that's true or not. And I go through Lowry and I say, you know these guys, have some of your guys that you know, that you trust, give me information, send it to me. Something shows up on my fax machine anonymously at 3 in the morning, it is at least a promising subject of inquiry. It may not be something I'm going to send somebody beyond a reasonable doubt to be executed, but it's at least a promising subject of inquiry and is in that sense very, very valuable information. Will you go with me that far? I'm – I'm following along, but I don't know how one would even follow that up at that point. Well, I think maybe you go to the other board of directors and say, look what I got, guys, let's – let's ask some more questions. I mean, I don't know what he wants to do, but he might do something. And exactly, that's what – what was going on all the time within this board of directors. Part of the record here, and I would encourage the court to look at the statement of undisputed facts that underlies the summary judgment that the court granted. You know what I'd like to look at? I'm having trouble because the record is so large. Can you point me to the parts of the deposition testimony that Mr. Stefano relies on as what he calls admissions? That is to say, the statements by the newspaper reporter as to what the newspaper reporter was told after this was filed as a tort suit. Can you point me to where that is in the excerpts? I'm afraid I won't be able to give you the precise citation to it. I can tell you where generally it's located. It is – it is part of a submission that the plaintiff made in opposition to the motion for summary judgment, and it is the testimony, I believe, of the – of the reporter for the Idaho newspaper. Oh, yeah, this I know. You don't have a page number of the tab in the excerpt. I don't. I'm sorry. I do not have that. That's all right. I can give it later. I do not have that. And I would like to address that, by the way, very briefly if I could, that whole subject matter of the – of the alleged conversation that occurred that was report upon by the newspaper and then later amended by a correction to their report. That does not – that information does not, in this case, create a triable issue of fact. I don't think there is any dispute that there was – there was, in fact, something known as the open door policy at this company, that that was a policy. It was articulated, by the way, in the employee handbook that each of the employees, including Mr. Stefano, had, which also articulated the at-will employment covenant or re-articulated that. The issue here is whether or not the open door policy can be relied upon as a modification, implied modification, of the express written agreement of the parties. And in 1986, Mr. Stefano signed an express agreement with Micron. He even had his signature notarized for purposes of it, which very clearly, succinctly states that his employment at Micron is at will. Now, his First Amendment complaint on which this motion is based further goes on to say that at the time that he was – was employed by Micron, he was also told about the open door policy and viewed that to be a benefit of his employment. Now, under those circumstances, there is no way that that open door policy then becomes something that limits the at-will covenant of this agreement. Well, you know, I regard that as a very problematic statement in light of Metcalf. The Metcalf, as I'm sure you know, is an at-will contract where the person has been supplied as part of the contract for sick leave benefits. She applies for sick leave benefits and she gets fired. And the Court says, well, that's a triable issue of fact as to whether or not the contract was impliedly modified, at least to this extent. And that strikes me as, well, you can modify an at-will employment contract even impliedly, and the question then is the question of fact is whether it has been. You can, but you cannot. The Jones v. Micron case that's cited in our brief stands for the proposition that you can't – you can't rely on a simultaneous expression of a policy. When you're there signing the at-will employment agreement, you can't at the same time point to a contemporaneous, simultaneous policy, which you now contend is a limitation upon the employer's rights. The position of Jones is basically that you can't have some implied rejection of a – of an express thing you sign. Is that – I mean, is that in a nutshell? That is – that is it. Here's the problem I think that appellant has, but I'm not sure the answer to it. But it seems like assuming for sake of argument that there is an open-door policy and that an employee can communicate with directors, it still may be that they have to do it in some appropriate scope and in some appropriate manner, and that it is a problem to send objective data, you know, to outside the company that could be confidential, or it may be a problem to give subjective comments about the president. But on the other hand, I'm not – I'm not certain that if there's an open-door policy, it shouldn't include also permitting someone to say, we've got a bad president. Well, that's our problem. You know, the organization is affected from the top, and you want to know what the problem is with yields? The problem is we've got a bad president. So what's the answer to that? Well, the answer is that's why the open-door policy is not part of the terms of employment here. It couldn't be a clear record of starting out with the signing of an express at-will covenant, having that at-will covenant confirmed in written form just a few years later in 1992, having that at-will covenant reemphasized in every republication of the employee handbook that there are no limitations on that – on the company's ability to terminate at-will. So we don't even have to go down that path. And we're dealing with Idaho law as to what is the effect of these at-will employment and other circumstances. It's a matter of Idaho law. Correct. And further, it is – I should say that it doesn't even rise to the level of debate as to whether this becomes a part of the terms of employment. What METCAP says is you have to apply a reasonable person standard to the facts and circumstances. Would they be sufficient to lead a reasonable person to conclude there's been some modification of the express terms of the agreement? Here, there was no evidence – no evidence presented by Mr. Stefano that would allow a court to conclude that there was a reasonable person who could conclude that this at-will policy had been modified in some respects by this open-door policy. Now, if I believe that the reporter originally reported accurately what was stated by the company representatives, assuming the truth of that statement, is there evidence? There is evidence of the existence of a policy. There's not evidence of the existence of a terms of employment, because that is simply – I mean, the policy itself, I think we reprinted that, is stated in the employee handbook. It says – But you say, I have trouble with – Idaho law seems to leave some room here. I'm now thinking of the Sorenson case. The guy moves to Washington, D.C. or kind of moves to Washington, D.C. He's promised – or at least he thinks he's promised – that, hey, we might make some adjustments in your salary level. He's an at-will employee. He asks for some adjustments in the salary level, and they can him. And the court says, well, you know what? You've got a tribal issue of fact. It says to go back and take a look at this in light of the ruling of the independent – Yeah, you've got a tribal issue of fact. So given these two cases together, it seems to me that in Idaho there is at least some flexibility of getting out from under the at-will for any reason whatsoever based upon things that are not written down, maybe stated orally, that this is the implied contract. There's a little squishy room, and I'm not quite sure what to make of those two cases, but there they are. There is some flexibility, but I submit it's a very narrow level of flexibility. Suppose the company announces to employees, you know, any employee who wants to take Friday afternoon off to go to mass can go on Good Friday. Just make that announcement. Somebody takes Good Friday off, goes to mass, they say you're fired. They say, well, we've got an at-will policy. Does he have any remedy for that? Under existing Idaho law, he would not. Unless that was deemed to be a public policy exception to the at-will, general at-will policy, he would not. So you can't – when you have an at-will policy, any representations the employer makes to the employee they should not believe or rely on, because if he follows what the employer tells him, he can be fired for doing it. There is some flex for representations, but here's what the district court correctly did here. They applied Idaho law and says you can't rely upon alleged representations that were made prior to the time that you re-signed, re-executed your at-will agreement. That's what the law provides in Idaho. You cannot do that. Further, you can't avoid your at-will employment covenant expressly stated in writing without any evidence, any concrete evidence of who said this, when did they say it, who was it that said it, on what – was there any reasonable basis for you to rely on such a representation? What we have here is our plaintiff who is simply saying, gee, this is what I thought, this is what was on my mind, without pointing to any representation or anything else that would allow him to come to this conclusion. Well, if he says, you know, I heard this regularly, this was said part of a company culture, it was said frequently, I don't remember which day by whom, and then says, but look, here's confirmation afterwards by the company, yes, that is our policy, then isn't the – what might otherwise be insufficiently definite and specific made sufficient by that general statement afterwards? I would submit that it is not. With a continual reaffirmance of this is at-will employment, this is the terms of your employment, I don't think there's any reasonable basis to conclude that there's been any limitation on that. I've noticed that I'm out of my time. I just wanted very briefly to say, to address the cross-appeal here, which is the fact that in our particular case, the Court has correctly concluded that Micron Technology was the prevailing party in this proceeding below, but in abuse of its discretion, failed to award any attorney's fees in any amount, notwithstanding the fact that Micron more than bore its burden of submitting more than adequate information on which to base such a ruling. Thank you very much. Thank you. Gentlemen, with all due respect to Lynn Windmill, who is a good friend of mine, we were friends before he was on the bench, this is the first time that I have felt like I am approaching an open mind, and I want to thank you for it. Let me say this, first of all, everything that we have said has been consistently mischaracterized. You are bright enough to see at least the possibility of something being a smokescreen. Our case is not based on prior representations. Okay? The cases that counsel refers to, yes, if I say, unfortunately, and this is a horrible aspect of the law, it's monstrous, but you can hire these people, you can tell them anything you want, and if you have them say, well, it means absolutely nothing. Idaho and every state that supports it will be ashamed of itself, and it will be someday. That's where the law is going. But we're not there yet. So let's talk about where we are right now. All that the law says is if those representations are made at the time that you get the sucker to sign it on the line, when he is in the employment position of the lady tied to the railroad tracks, you used to see snidely whiplash, okay, if you get them to sign that, tell them anything you want. They got no rights, okay? So the idea is that in this case, we're not talking about an express contract, but you can put up a sign anywhere you want, all over the thing. We value a corporate culture. Now, first of all, let me ask you this. As a matter of law, would you say that no company in the competitive marketplace that existed could say, hey, one of the benefits you get here is freedom of speech? We're not talking about freedom of speech. Can I interrupt? Yes, please do. And I can tell you where those sites are if you like. What I'm worried about is where your argument might be leading. I think your argument might be leading that if at the time he signs his at-will contract, he is told we have an open-door policy, you lose. No, absolutely not. Okay. But I don't think you want to go there. No, absolutely not. I think if under Idaho law, as despicable as it is, if that was the only evidence that he had, okay, they got it from Arizona, so we can blame it on them. But as despicable as that is, if that's all he had, we lose, okay? The question is, is there any evidence that after that, because one of the reasons you couldn't possibly have an open-door policy if you say at-will, you couldn't believe it, okay? Well, you see, I'm not sure that that's right. There is an at-will policy. There's an at-will policy when he signs it. There's an at-will policy after he signed it. There's an at-will policy today. The question is whether or not it is implied, the at-will is impliedly limited by certain things that have been said simultaneously or later. Right. Also, it seems to me at least that you could have both an at-will employment policy as a matter of law and agreement and still have an open-door policy. It would be like saying, if a director comes by your office, your door better be open. Tell them whatever you want. We expect you to talk to the directors, but that doesn't mean we can't terminate you anytime because we don't like the color of your eyes or whatever. I mean, they're not necessarily inconsistent logically. I don't think. I could be missing something. But when it comes to logical consistency, you gentlemen are probably way beyond me. All I know is this. If you tell somebody it's at-will, then you maintain on your computer systems things saying share good results with anybody, good or bad. If the corporation admits they had a policy that nobody could be retaliated against. I mean, we talk about fraud. They're saying we don't really mean it. It's not binding on us. OK. When we get in trouble, when the public gets mad at us, when we start to look Enron, well, we could just get on TV and say, well, we have a policy that we don't retaliate against anybody. So don't worry about it. They've maintained this policy. And that's the evidence. And they maintained that long after they had forced these people for all practical purposes to sign this. I would appreciate if you could comment on one issue. Let me assume that we decide with you all the way that there is an at-will or an open door policy and that to some extent there's an open door policy that would constrain the at-will doctrine despite, you know, the Idaho precedents or whatever. Right. OK. Well, still, what would be the limits on the open door policy? I mean, that surely couldn't mean, for example, that an employee could go to a director and say to the director, I have all kinds of personal dirt about, you know, President so-and-so unrelated. It's not directly related to. I mean, I'm assuming they could. I don't know what your position would be. But here, part of the issue is whether and I know Micron says he couldn't even give the director the data, but assuming given the data, he went beyond the data with that. We've got a bad president comment. Our president has no vision. Now, is there any limit? Assuming there is an open door policy, is it constrained in any way by the other express policies against insubordination and, you know, requiring teamwork or whatever? OK. Well, first of all, let me make sure we're talking about two separate things here. One is an implied contract where they have the right to do this. And one is the public policy exception, which I think is nearer. OK. The public policy exception is what you asked me about, sir. Let me say this. I think that the issue then would be whether or not the conduct was reasonable and whether or not what was the real motivation of firing? Remember that when they fired Mr. Stefano, what they put in his papers that he'd follow in the rest of his life was not that he criticized the boss and he didn't like it. They said he disclosed confidential information to outsiders. In the high-tech business, that's about like saying that a judge was corrupt and took a bribe. And that's what's in his record. If he has to provide his records to somebody, that's what they said about him. OK. Now they just say, well, no, it wasn't that, but he gave them more than was asked for, and it was critical. And we can't have that. Now, fine. Good argument for the jury. Let them tell them that. They tried to tell them that in the reason I gave you the verdict result. That's what they tried to sell in the defamation case, and the jury didn't buy it. May I ask you a question about your theory on that it's a breach of public policy? In Idaho, can you find public policy in some sort of general philosophical doctrine, or does public policy have to be expressed in the statute? Well, that's a very good question, because that's the problem the district court had. Prior to Thomas, I don't think that there was a case that said it had to be in a statute, but certainly it leaned that way. OK. Thomas just came down last December. What happened in Thomas was, Thomas was a doctor. Are you a chemistry association? Yes. I said it's both sides of supplementary material. OK. I think I've not read that case yet. OK. What happened in Thomas is Thomas is a doctor, and he did the unthinkable thing. OK. He was in a medical group, and he told those people, look, these doctors are doing unnecessary operations, and the records are false. OK. Now, the Supreme Court, written by Justice Schroeder, said that, number one, the conduct was protected by the public policy. But more importantly, it said he did not have to go to an outside organization, which has been the position of Mike Brown. It was sufficient that he did it within the company, if that makes sense. And what they said was there were two, there's three ways that you can be protected. OK. It's stated in beautifully abstract and therefore applicable terms. One, if the employee is being asked to commit an unlawful act, which is not important here. Two, if the employee is being asked to do something, if the employee is engaged in conduct by reporting that it involves an important public obligation or duty. OK. There's something important to two things. Now, if you look at Thomas, the doctor, the false records is a criminal violation. OK. But the court didn't just say, well, he's protected by that. They said going to people and saying you're doing unnecessary obligations was protected conduct. OK. But that would be sort of like fraud doing unnecessary operations. So is that different than saying the president has no vision? Well, I think that the problem I certainly that's a distinction can be drawn. OK. And it's a fair one. The problem that I have with it is I have no doubt that those three doctors felt that they weren't unnecessary operations. And so, you know, it would have been regarded as disruption. But I see what you're saying. And, you know, I'm not sure that all of Mr. the public policy, if all there was, was criticism of the president here and if it hadn't been invited by the board member in the position that he was in. See, and that's why I talk about the public obligation. There is no way that Hess can perform his obligations without Stefano and the others complying with it. And with this case, what a public policy except the exception is in Idaho is Thomas. Yes. OK. All right. Well, we'll read that. I think your time is expired. Oh, OK. There's more time on the clock. No, that's the time you're over. Oh, that's the time you owe us. Thanks. We give it freely. Appreciate it. Sorry if I get too upset. Thank you very much. Thank you both. Very nicely argued by both sides. Both sides. Case just argued to be submitted. Court will stand and recess for the day. All right. Thank you.
judges: Reinhardt, W Fletcher, Gould